## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-20239CR-HUCK/O'SULLIVAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | **CRIMINAL** |
| v. | : | |
| | : | |
| LATIN NODE, INC., | : | |
| | : | |
| Defendant. | : | |

### STATEMENT OF OFFENSE

The United States and Defendant LATIN NODE, INC. ("LATINODE") agree that the following facts are true and correct:

*LATINODE AND OTHER RELEVANT ENTITIES AND INDIVIDUALS*

1.     Defendant LATIN NODE, INC. ("LATINODE"), headquartered in Miami, Florida, was incorporated in Florida, and thus was a "domestic concern" as that term is used in the FCPA, 15 U.S.C. § 78dd-2(h)(1)(B). LATINODE provided wholesale telecommunications services using internet protocol technology in a number of countries throughout the world, including Honduras and Yemen. LATINODE provided these services both directly and through its subsidiaries.

2.     LN Comunicaciones, a Guatemalan company headquartered in Guatemala City, Guatemala, was a wholly owned subsidiary of LATINODE that maintained an international call center for LATINODE customers and carried out LATINODE business in Honduras, Guatemala, El Salvador, Nicaragua, and various locations in the Caribbean.

LN Comunicaciones maintained its own bank account in Guatemala City, Guatemala, but that account was fully funded by LATINODE from its Miami, Florida bank account.

3.      Servicios IP, S.A. ("Servicios IP") was a Guatemalan company nominally owned by two LN Comunicaciones employees that was created at the direction of LATINODE and LN Comunicaciones in 2005 to sell refurbished cellular telephones. Servicios IP never fully carried out that original corporate purpose, but it subsequently entered into sham agreements to facilitate corrupt payments by LATINODE to Honduran government officials.

4.      Hondutel, the Honduran government-owned telecommunications company headquartered in Tegucigalpa, Honduras, was an "instrumentality " of the Honduran government, and thus its employees and directors were "foreign officials" under the FCPA.  15 U.S.C. § 78dd-2(h)(2)(A).  LATINODE entered into an interconnection agreement with Hondutel, under which LATINODE paid Hondutel a certain price per minute of voice connection based on a required number of minutes to be purchased by LATINODE each month.

5.      "Official A," a Honduran citizen, was a Hondutel employee who headed the evaluation committee responsible for awarding interconnection agreements with private telecommunications companies that wished to use Hondutel's network.

6.      AAA Telefónica ("AAA"), a Honduran company headquartered in Tegulcigapa, Honduras, was controlled by an individual believed to be the brother of Official A. AAA entered into a sham agreement with Servicios IP, which in turn entered into a sham agreement with LN Comunicaciones.  The purpose of both sham agreements was to facilitate corrupt payments by LATINODE to Hondutel officials.

7.     "Official B," a Honduran citizen, was a senior executive of Hondutel from in or about February 2006 to in or about December 2007.  Official B had broad decision-making authority and influence over interconnection agreements and their accompanying rates.

8.     "Official C," a Honduran citizen, was an attorney in the Hondutel legal department who worked directly for Official B.

9.     TeleYemen, the Yemeni government-owned telecommunications company headquartered in Sana'a, Yemen, was an "instrumentality" of the Yemeni government, and thus its employees and directors were "foreign officials" under the FCPA.  15 U.S.C. § 78dd-2(h)(2)(A).

10.     "Yemen Partner A," a dual United States and Egyptian citizen, through his privately owned company, signed an interconnection agreement with TeleYemen in or about early 2003.  LATINODE understood that Yemen Partner A received a favorable rate under the interconnection agreement because of his close relationship with the son of a top level Yemeni executive official, and because he paid "commissions" to various officials of TeleYemen.  Yemen Partner A entered into a revenue sharing agreement with LATINODE in or about March 2004 under which LATINODE paid Yemen Partner A to use his favorable interconnection agreement and equipment in Yemen.  LATINODE understood that some or all of the money it paid to Yemen Partner A was passed along to officials of TeleYemen in exchange for continued favorable rates.

11.     "Executive A," a United States citizen, was a senior executive of LATINODE from in or about 1999 to in or about 2007.  Throughout that time period, Executive A had authority to set company policy, contract with telecommunications

3

companies, hire and fire employees, set sales prices, and approve sales practices in foreign countries. Executive A was aware of and authorized corrupt payments made by LATINODE to officials of Hondutel and TeleYemen.

12. "Executive B," a Honduran citizen, was a senior executive of LATINODE from in or about September 2004 to in or about 2007. Throughout that time period, Executive B was responsible for LATINODE's business development in Honduras. Executive B was aware of and involved in corrupt payments made by LATINODE to officials of Hondutel and TeleYemen.

13. "Executive C," a United States citizen, was a senior commercial executive of LATINODE from in or about November 2000 to in or about 2007. Executive C was aware of and involved in corrupt payments made by LATINODE to officials of Hondutel and TeleYemen.

14. "Executive D," a Mexican citizen and United States permanent resident alien, was a senior financial executive of LATINODE from in or about March 2005 to in or about 2007. Executive D was aware of and authorized corrupt payments made by LATINODE to officials of Hondutel and TeleYemen.

15. "Executive E," a Guatemalan citizen, was a senior executive of LATINODE and managed LN Comunicaciones in Guatemala from in or about early 2000 to in or about 2007. Executive E was aware of and involved in corrupt payments made by LATINODE to officials of Hondutel.

*CORRUPT PAYMENTS TO HONDURAN OFFICIALS*

16.     From at least November 2003 through in or about December 2005, LATINODE sought Official A's assistance in winning an interconnection agreement with Hondutel, which would permit LATINODE to use Hondutel's telecommunications lines.

17.     On or about September 30, 2004, Executive B drafted a project status report for internal distribution explaining that LATINODE "relies on the support of [Official A] to be among the selected [contract recipients]." On the same day, Executive B sent an email to Executive A explaining that "[Official A] is going to help us with the different commissions and will impart all information regarding competitive intelligence about what's going on in the [bidding] process." Executive B also wrote that "[Official A] holds a lot of sway in the company and [our representative] is winning her over with a 'prize' if she makes possible that [LATINODE] obtain the interconnection."

18.     On or about December 5, 2005, LATINODE learned it was the sole winner of the interconnection agreement with Hondutel, despite what it knew to be "financial weaknesses" in its proposal.

19.     In or about early December 2005, shortly after winning the interconnection agreement, LATINODE caused LN Comunicaciones and Servicios IP to sign a purported "consulting" agreement. At the same time, Servicios IP signed a purported "consulting" agreement with AAA, the company believed to be controlled by Official A's brother.

20.     On or about December 7, 2005 – two days after winning the Hondutel contract – Executive E, on behalf of LN Comunicaciones, signed a check for $100,000 to Servicios IP. On or about December 8, 2005, on behalf of LN Comunicaciones,

Executive E signed a check for $200,000 to Servicios IP.  LATINODE knew and intended that some or all of the $300,000 in checks would be passed along to Hondutel officials through the sham agreements.

21.     From in or about May 2006 to in or about November 2006, LATINODE sought to negotiate with Hondutel a reduction in the rate per minute under the interconnection agreement.

22.     On or about May 16, 2006, Executive C emailed Executive A and Executive B, emphasizing the necessity of securing the lower rates.  Executive B replied that Hondutel officials had informed him that it would be "necessary to 'give' something" to them in order to obtain the preferential rate and the capacity LATINODE desired.

23.     In or about August and September 2006, Executive B corresponded via email directly with Official B and Official C regarding payments LATINODE agreed to make to them in exchange for the favorable rate.  These emails contained the bank account information of Official B and Official C.

24.     In or about September 2006, LATINODE began making payments directly to Official B and Official C in the hopes that they would confirm LATINODE's reduced rate per minute under the interconnection agreement.

25.     In or about November 2006, Official B, Official C, and LATINODE entered into a verbal agreement to reduce the rate by two cents per minute, but the parties agreed to keep the written contractual rate the same to avoid detection.  In exchange for the rate reduction, LATINODE agreed to make corrupt payments to Official B, Official C, and other Hondutel officials.  In order to conceal the reduction in rate, LATINODE

began documenting a higher number of minutes purchased per month. Consequently, the calculation of the higher number of monthly minutes by the new verbally agreed lower rate per minute equaled the same amount as under the previous arrangement.

26.     In or about June 2007, LATINODE hired Official A, who left Hondutel, and made her responsible for business development in Latin America and the Caribbean.

27.     In or about August 2007, LATINODE agreed to enter into arrangements to pay to two Hondutel billing employees so that they would assist with the false calculation of minutes per month to allow for the continued reduced rate per minute.

28.     From in or about March 2004 through in or about June 2007, LATINODE paid or caused to be paid a total of approximately $1,099,889.73 to Servicios IP, certain LATINODE employees, and certain Honduran officials, for the purpose of paying bribes to Official A, Official B, Official C, and various other Honduran officials in exchange for obtaining and retaining the interconnection agreement, and for reducing the rate per minute paid under the interconnection agreement. Each of those payments was made from LATINODE's Miami, Florida bank account, and each payment was approved by either Executive A or Executive D, or both. The approximately $1,099,889.73 in payments included the following:

a.     From in or about December 2005 to in or about June 2007, LATINODE paid approximately $517,689 to Servicios IP, knowing that some or all of those funds would be passed along to Official A, Official B, Official C, and other Honduran officials in exchange for favorable treatment relating to its interconnection agreement with Hondutel.

b.      From in or about March 2004 to in or about November 2006, LATINODE paid approximately $141,000 in cash to various LATINODE employees, knowing that some or all of those funds would be passed on to Honduran officials in exchange for favorable treatment relating to LATINODE's interconnection agreement with Hondutel.

c.      From in or about May 2006 to in or about June 2007, LATINODE paid approximately $440,200.73 directly to various Honduran officials, including but not limited to Official B and Official C, in exchange for favorable treatment relating to LATINODE's interconnection agreement with Hondutel.

### *CORRUPT PAYMENTS TO YEMENI OFFICIALS*

29.    In or about early 2004, LATINODE was seeking to enter the mobile telecommunications business in Yemen.  LATINODE learned that Yemen Partner A had obtained an interconnection agreement with TeleYemen at a favorable rate, and LATINODE sought to partner with Yemen Partner A to gain entry into the Yemen market.  LATINODE understood that Yemen Partner A had received the favorable rate by making corrupt payments to certain Yemeni officials.

30.    In or about March 2004, LATINODE entered into a revenue sharing agreement with Yemen Partner A under which LATINODE paid Yemen Partner A to use his favorable interconnection agreement and equipment in Yemen.  Under the revenue sharing agreement, LATINODE received 60% of the profits, and Yemen Partner A received 40% of the profits.  LATINODE understood and agreed that some or all of the money it paid to Yemen Partner A would be passed along to officials of TeleYemen in exchange for continued favorable rates.

31.     On or about November 17, 2005, Executive B wrote in an email that "[Yemen Partner A] claims to have very good relationships with the son of the president of Yemen and with high level executives of TeleYemen. This could be true knowing he got a service agreement with a preferential termination rates [sic] and [Yemen Partner A] does not have an infrastructure in USA [sic]. He pays commission [sic] to people inside TeleYemen."

32.     On or about February 13, 2005, Executive B wrote in an email that in connection with the business arrangement with TeleYemen, [Yemen Partner A] had "mentioned two person [sic], one the Son of Yemen P . . . and the Vice President of Operation [sic] in TeleYemen. Also mentioned a Group of people from the Minister [sic], and high and medium level executives of TeleYemen." (Ellipses included in original.)

33.     From on or about July 14, 2005 to on or about April 4, 2006, LATINODE made a total of seventeen payments totaling approximately $1,150,654.36 either directly to Yemeni officials or to Yemen Partner A with the knowledge that some or all of the money would be passed along to Yemeni officials in exchange for favorable interconnection rates in Yemen. Each of those payments was made from LATINODE's Miami, Florida bank account, and each payment was approved by either Executive A or Executive D, or both. Executive B and Executive C were also aware of at least some of the payments.

34.     On or about May 2, 2006, Executive B wrote an email to an individual LATINODE was considering as a prospective replacement for Yemen Partner A, and copied Executive A and Executive D on the email. In describing LATINODE's business

CASE NO. 09-20239CR-HUCK/O'SULLIVAN

strategy, Executive B wrote: "LATINODE can approach directly to [sic] the individuals in charge of the international operations (at directors or VPs level) directly [sic] or when they attend international meetings . . . . Normally is needed [sic] to pay a commission to get a preferential termination rates [sic] if the selected company is a government entity . . . . Other strategy we use [sic] is the top-bottom using a facilitator (Agent).  Using this strategy is required [sic] to have contacts in the government level (President, Ministers, CEO and/or VPs, of the target company), politicians, high rank militaries [sic], businessman [sic] and other individual [sic] can order or influence in [sic] the decision makers in the selected company to sign the service agreement . . . . Because the level of the influence of people involved is expected to have preferential rates (better than the bottom-up strategy) to have enough

margin to pay commission to the facilitator and the contacts use for the facilitator [sic] . . . . Depending on the country LATINODE use [sic] the Top-down, bottom-up or a combination of both . . . . This is a case-by-case game."

STEVEN A. TYRRELL, Chief
Fraud Section, Criminal Division

By:  _Lori A. Weinstein_

Lori A. Weinstein
Trial Attorney - Foreign Corrupt Practices Act
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005

CASE NO. 09-20239CR-HUCK/O'SULLIVAN

**DEFENDANT'S ACCEPTANCE**

I have read this Statement of Offense.  Pursuant to Fed. R. Crim. P. 11, and on

behalf of Latin Node, Inc., I accept and acknowledge responsibility for the acts of Latin

Node Inc.'s officers and employees and I admit that the evidence supporting the

Statement of Offense establishes that Latin Node, Inc. is guilty of the crimes to which it

is pleading guilty.

Date: ___3 - 30 - 09___                      ___Harley L. Rollins___

                                         HARLEY "MIKE" ROLLINS, DIRECTOR
                                         FOR LATIN NODE, INC.